### KELSEY v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. January 10, 1908.)

1. MUNICIPAL CORPORATIONS—DEFECTS IN WATER COURSES—LIABILITY OF PERSON CAUSING DEFECT.

    A city, in relocating a water main, to permit the building of a rapid transit station, is not liable for a failure to select the best possible route or to adopt the best possible plan of construction, if those selected were reasonably safe.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, §§ 1780, 1781.]

    107 N.Y.S.—69

2. Trial—Conduct of Counsel—Appeal to Prejudice.

In an action against a city for damages resulting from a bursted water main, it was improper for plaintiff's counsel to bring before the jury the fact that the city and the contractor, who was a party defendant, were indemnified by a bond from the subcontractor, who did the work, justifying reversal on appeal.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 303–307.]

Appeal from Trial Term.

Action by Julia R. Kelsey against the city of New York and others. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant city of New York appeals. Reversed.

Argued before PATTERSON, P. J., and McLAUGHLIN, HOUGHTON, SCOTT, and LAMBERT, JJ.

R. E. T. Riggs, for appellant.

E. J. Murphy, for respondent.

SCOTT, J. The plaintiff has recovered a judgment against the city of New York for injury caused to certain personal property contained in the basement of a house in West Ninety-Second street. The injury resulted from the bursting of a water main on Broadway, between Ninety-First and Ninety-Second streets. John B. MacDonald was originally included as a defendant, but at the close of the case the complaint was dismissed as to him. Under the contract and plans for the construction of the rapid transit road, it became necessary, in order to provide for the station at Ninety-First street and Broadway, to shift a 36-inch water main running along Broadway. Originally the main ran under the roadway east of the westerly sidewalk. To make room for the station, a new section of main was put in, being carried from the old main at an angle until it came under the sidewalk a short distance below Ninety-First street, thence along under the sidewalk to a point a short distance above Ninety-First street, and thence again at an angle to connect with the old main. In order to effect this diversion, it became necessary to carry the new main diagonally over a brick sewer running under the sidewalk. The water main was laid 3 or 4 feet below the surface to avoid freezing, and there was a clearance of about 4 inches between it and the top of the sewer. The relocation of the sewer was done by the subcontractor under MacDonald, the general contractor for the rapid transit road. The work was completed and the water turned into the relocated main on December 16, 1901. The break occurred on February 19, 1904, just at the point where the water main crossed over the brick sewer.

It is not clear why the main broke. The plaintiff's theory, and it is only a theory, is that it was insufficiently supported, and that it settled or sagged, so that its weight came upon the sewer. Clearly this may have been the cause; but the evidence tended to show that there may have been other causes having no relation to the manner in which the main was built or supported. It is not necessary to consider at length the contract between the city and MacDonald. It is sufficient to say that the duty of properly constructing and supporting the main fell primarily upon the latter, or his subcontractor. Whatever duty rested upon the city went no further than to exercise reasonable care to

see that the work had been properly done before the water was turned into the new section of main, and it cannot be held liable unless it knowingly or carelessly put an unsafe and improperly constructed water main into use.   Certainly the city can be held to no more stringent rule of liability than it would have been subject to if it had undertaken to relocate the main itself, through a contract with an independent contractor.   In that case it would not have been obliged, at its peril, to select the best possible route, or to adopt the best possible plan, provided the route selected and the plan adopted were reasonably safe. Uppington v. City of N. Y., 165 N. Y. 222–228, 59 N. E. 91, 53 L. R. A. 550.

In the present case, under the rapid transit act, the city had little or no control over the contractor, or power to dictate how he should perform the work required by his contract.   Much evidence was given as to whether or not the main was properly supported.   The method adopted was to support the pipe by hemlock bed blocks rammed into the earth on either side of the sewer.   The plaintiff called a single expert witness, who had never examined the work or the locus in quo, who testified, in answer to a hypothetical question, that in his opinion it would have been better and safer to have supported the main upon a cement foundation.   He conceded, however, that if the ground on either side of the sewer was sufficiently hard or settled, as to which he had no knowledge, the use of hemlock bed blocks would be safe and proper.   The method of construction which was in fact adopted was approved by a number of experienced engineers and pipe layers, who had observed the work while in progress and were thoroughly familiar with the conditions under which it was done, and the engineers called by the defense agreed in testifying that, in their opinion, the use of a cement foundation would, for reasons which they gave, have been bad practice from a technical standpoint, and in any event quite unnecessary.   The question, therefore, whether a proper method of construction was adopted, resolved itself into one of expert opinion, of which the very great preponderance was in favor of the plan and method which was adopted for supporting the main.   At the very most, even accepting the evidence of the plaintiff's expert, the city could be charged with nothing worse than an error of judgment, and upon all the evidence in the case there was no ground for charging it with so much.   Of negligence on its part there is no evidence, nor is there ground for charging it with having knowingly or negligently accepted and put into use an improperly constructed main, and consequently no actionable liability on the part of the city was established, and for this reason the judgment must be reversed.

We are unwilling to leave the case, however, without reference to the extremely improper action upon the part of the counsel for the plaintiff in bringing to the attention of the jury the wholly irrelevant fact that MacDonald (as to whom the complaint had not yet been dismissed) and the city of New York were indemnified by a bond from the subcontractor who had performed the work of relocating the sewer.   This alone would have been sufficient to call for a reversal of the judgment, even if no other reason had existed.   To mention such a fact upon the trial, or in any way to bring it to the attention of

the jury, can have no legitimate bearing upon the issues in the action, and can have no purpose, except to prejudice the jury in favor of the plaintiff. This practice, which we regret to observe is becoming all too common in damage suits, has been so frequently and so pointedly condemned by the Court of Appeals and this court that no counsel engaged in the trial of causes can plead ignorance of its impropriety. When counsel persists in pursuing it, the trial court should not hesitate, if requested by the defendant, to withdraw a juror and order a retrial before another jury. Failing that, this court, when it appears that the verdict may possibly have been influenced by the reference, will not hesitate to reverse the judgment.

Judgment and order reversed, and new trial granted, with costs to appellant to abide the event.

McLAUGHLIN, HOUGHTON, and LAMBERT, JJ., concur; PATTERSON, P. J., concurs in result.